IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY HAMMOND MURPHY,<br><br>Plaintiff,<br><br>v.<br><br>THE MAST GENERAL STORE, INC.,<br><br>Defendants. | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Anthony Hammond Murphy ("Mr. Murphy" or "Plaintiff") seeks a permanent injunction requiring a change in The Mast General Store, Inc.'s ("Mast General" or "Defendant") corporate policies to cause its online store to become and remain accessible to individuals who are partially sighted, visually impaired, or totally blind. In support thereof, Mr. Murphy respectfully asserts as follows:

**INTRODUCTION**

1.  Mr. Murphy lives in Erie, Pennsylvania where he works for the Commonwealth of Pennsylvania; he graduated from Edinboro University, with a degree in sociology, in 1999.

2.  Mr. Murphy is legally blind and an advocate for others who have visual impairments too. *See* GoErie.com, How did Erie plow crews do?: Your view from Facebook (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.") (last accessed Mar. 16, 2020).

3. As a result of his blindness, Mr. Murphy relies on screen reader software, including JAWS from Freedom Scientific and VoiceOver with iOS to access information electronically.

4. Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.*; *See also* American Federation for the Blind, *Screen Readers*, *available at* https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last accessed August 27, 2019) (discussing screen readers and how they work).

5. Mast General is retailer that sells outdoor gear, apparel, and accessories direct to consumers. Although Mast General operates brick-and-mortar retail storefronts which customers may visit in North Carolina, South Carolina, and Tennessee, much of Mast General's consumer business is done entirely online.

6. In order to research and purchase the products that Mast General sells, online shoppers must visit Mast General's online store, located at www.mastgeneralstore.com (the "Website"), a website Mast General owns, operates, and controls.

7. Mast General is responsible for the policies, practices, and procedures concerning the Website's development and maintenance.

8. Unfortunately, Mast General denies approximately 8.1 million Americans who have difficulty seeing access to the Website's goods, content, and services because the Website is largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed August 27, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

9. Mr. Murphy brings this civil rights action against Mast General to enforce Title III, which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

10. By failing to make its Website, a service of a public accommodation subject to Title III, available in a manner compatible with screen reader programs, Mast General deprives individuals who are partially sighted, visually impaired or totally blind the benefits of the goods,

content, and services of its online store—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

11. Because Mast General's Website is not and has never been accessible, and because upon information and belief Mast General does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Website to become and remain accessible, Mr. Murphy invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction as more fully stated hereafter.

12. Defendant, therefore, must retain a qualified consultant acceptable to Plaintiff ("Approved Accessibility Consultant") who shall assist it in improving the accessibility of its Website, including all third-party content and plug-ins, so the goods and services on the Website may be equally accessed and enjoyed by individuals with vision related disabilities.

13. Defendant, therefore, must work with the Approved Accessibility Consultant to ensure that all employees involved in website development be given accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages.

14. Defendant, therefore, must work with the Approved Accessibility Consultant to perform an automated accessibility audit on at least a quarterly basis to evaluate whether Defendant's Website may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis.

15. Defendant, therefore, must work with the Approved Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in

the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools.

16. Defendant, therefore, must incorporate all of the Approved Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations.

17. Defendant, therefore, must work with the Approved Accessibility Consultant to create an Accessibility Policy that will be posted on its Website, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems.

18. Defendant, therefore, must directly link from the header of the homepage and the footer on every other page of the Website a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Website to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Website.

19. Defendant, therefore, must accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy.

20. Defendant, therefore, must provide a notice, prominently and directly linked from the footer on each page of the Website, soliciting feedback from visitors to the Website on how the accessibility of the Website can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy.

21. Defendant, therefore, must provide a copy of the Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Website.

22. Defendant, therefore, must train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website. Defendant shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance.

23. Defendant, therefore, must modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to be inaccessible to users of screen reader technology.

24. For a period up to two (2) years after the Approved Accessibility Consultant validates the Website is free of accessibility errors/violations, Defendant, therefore, must provide Plaintiff's Counsel with Quarterly Reports on the progress it is making towards implementing various provisions of this Agreement, including Defendant's effort to create and implement an Accessibility Policy, testing procedures, the training of its employees involved in website accessibility, and information regarding Defendant's continued evaluation of its provision of an accessible online store. Defendant shall also report on and provide a summary of formal grievances it receives regarding the accessibility of its online store, and shall provide a summary of its responses to such grievances to Plaintiff's Counsel.

25. Counsel for Plaintiff and Counsel for Defendant will hold regularly scheduled telephonic meetings within 30 days of the submission of Quarterly Reports in order to discuss ongoing progress towards the implementation of proper accessibility policies and practices. To this end, Plaintiff, through his counsel and its experts, shall be entitled to consult with the Approved Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Approved Accessibility Consultant provides Defendant.

26. In sum, electronic information technology features and content are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing.

## JURISDICTION AND VENUE

27. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

28. Mast General attempt to, and indeed do, participate in the Commonwealth's economic life by offering and providing products and services over the Internet to Pennsylvania residents, including Mr. Murphy. Unlike, for example, a winery that cannot sell and ship wine to consumers in certain states, Mast General purposefully avails itself of the benefits and advantages of operating an online business open 24-hours a day, 7-days a week, 365-days a year to

Pennsylvania residents. *See Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same). These online sales contracts involve, and indeed require, Mast General's knowing and repeated transmission of computer files over the Internet. *See Gniewkowski v. Lettuce Entertain You Enterprises*, Order, ECF 123 (W.D. Pa Apr. 25, 2017) clarified by Order of Court, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab).

29. As described in additional detail below, Mr. Murphy was injured when he attempted to access Mast General's Website from Erie, Pennsylvania but encountered barriers that denied him full and equal access to Mast General's online goods, content, and services.

30. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Mr. Murphy' claims occurred.

## PARTIES

31. Mr. Murphy is a natural person over the age of 18. He resides in and is a citizen of Erie, Pennsylvania, located in Erie County.

32. Mr. Murphy is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

33. Defendant The Mast General Store, Inc. is a North Carolina corporation with a principal place of business at 300 N Greene Street, Suite 1400, Greensboro, NC 27401.

34. Based on the public information available to Mr. Murphy, Mast General has the resources available to make its online store accessible to screen reader users: Mast General sells

and ships its products throughout the contiguous United States, including into Pennsylvania; it operates a robust social media marketing campaign; it maintains many brick-and-mortar stores; and more than 135,000 people follow Mast General on Facebook, including those from Pennsylvania.

## FACTS APPLICABLE TO ALL CLAIMS

35. While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

36. Mast General's Website allows consumers to research and purchase its products from the comfort and convenience of their own homes, and arrange for home delivery.

37. Mast General is responsible for the policies, practices, and procedures concerning the Website's development and maintenance.

## HARM TO PLAINTIFF

38. Mr. Murphy attempted to access the Website from Erie, Pennsylvania. Unfortunately, because of Mast General's failure to build its Website in a manner that is compatible with screen reader technology, Ms. Murphy is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access on the Website.

39. Plaintiff attempted to access the Website using VoiceOver with iOS.

40. "VoiceOver is a gesture-based screen reader that lets you enjoy using iPhone even if you don't see the screen. With VoiceOver enabled, just triple-click the Home button to access it wherever you are in iOS. Hear a description of everything happening on your screen, from battery

9

level to who's calling to which app your finger is on. You can also adjust the speaking rate and pitch to suit you…You can control VoiceOver using a simple set of gestures. Touch or drag your finger around the screen and VoiceOver tells you what's there. Tap a button to hear a description, then double-tap to select. Or flick left and right to move from one element to the next. When you interact with an element, a black rectangle appears around it so sighted users can follow along. When you prefer privacy, you can activate a screen curtain to turn off the display completely, but still hear all that VoiceOver has to say. *See* Apple, Accessibility, *available at* https://www.apple.com/accessibility/iphone/vision/ (last accessed Apr. 1, 2018).

41. Unfortunately, as a result of visiting Mast General's Website, and from investigations performed on his behalf, Mr. Murphy found the Website to be largely unusable due to various barriers that deny him full and equal access to the goods and services that Mast General offers. For example:



a. The Website does not provide a sufficient text equivalent for many important non-text elements. Providing text alternatives allows information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, shoppers who perceive content visually will see an image on the Website's homepage with text that provides: "FREE SHIPPING ON MOST ORDERS $39+ *SOME EXCLUSIONS APPLY $5.99 FLAT RATE SHIPPING ON ORDERS UNDER $39 *SOME EXCLUSIONS APPLY SHIP TO STORE IS ALWAYS FREE." Shoppers who perceive this content visually can make

their purchases decisions with this important shipping information in mind. Unfortunately, the alternative text associated with this image provides: "free hipping info." This alternative text is insufficient because it does not describe the details that shoppers who do not rely on screen reader auxiliary aids can perceive. As a result, Mr. Murphy is less informed than are other shoppers because Mast General's accessibility policies fail to accommodate his disability.



b. The Website uses visual cues to convey content and other information. Unfortunately, screen readers cannot interpret these cues and communicate the information they represent to individuals with visual disabilities. For example, shoppers who perceive content visually will notice that many products available for purchase on the Website include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. Shoppers who can see will likely infer that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Unfortunately, screen readers cannot identify the meanings of these two fonts so that their users can make an informed decision. Instead, Mr. Murphy hears two prices for the same product, and cannot determine what they signify, like different quantities, conditions, sizes, or in this case, sales. This confusion prevents Mr. Murphy from making informed purchasing decisions, and increases the odds he will abandon the purchase process without making a selection at all.

c.  The Website prevents screen reader users who navigate sequentially through content from accessing primary content directly. For example, upon visiting the Website, shoppers who perceive content visually will perceive that many products available for purchase come in different colors. Unfortunately, because Mast General's accessibility policies fail to ensure the Website is compatible with screen reader auxiliary aids, Mr. Murphy cannot select a color while his screen reader is turned on. As a result, he cannot complete a purchase independently. 

d.  The Website prevents screen reader users from accessing primary content. For example, the Website provides a Size Chart that shoppers may review to determine what size apparel to purchase. Size charts are particularly important to consumers who shop online because they lack the opportunity to try on products, like the apparel that Mast General sells, before purchasing. Unfortunately, the Website prevents Mr. Murphy from tabbing to these Size Charts. Instead, screen readers remain focused on the content of the Website's underlying pages. As a result, Mr. Murphy is unable to access the sizing information he  requires to confidently purchase apparel that will fit, making it likely he abandons the online shopping experience before making a purchase.



e. The Website does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, shoppers who perceive content visually will notice various logos on the Website's checkout platform identifying the payment methods that Mast General accepts, including Visa, Mastercard, American Express, and Discover. Unfortunately, Mast General's accessibility policies fail to ensure all of these logos include sufficiently descriptive alternative text. As a result, Mr. Murphy is unable to determine whether Mast General accepts his preferred method of payment.

42. These barriers, and others, deny Mr. Murphy full and equal access to all of the services the Website offers, and now deter him from attempting to use the Website. Still, Mr. Murphy would like to, and intends to, attempt to access the Website in the future to research the goods and services the Website offers or to test the Website for compliance with the ADA. *See Heinzl v. Cracker Barrel Old Country Stores, Inc.*, 2:14-cv-1455, 2016 WL 2347367, at *21 (W.D. Pa. Jan. 27, 2016), *report and recommendation adopted as modified sub nom. Heinzl v. Cracker Barrel Old Country Store, Inc.*, 2:14-CV-1455, 2016 WL 1761963 (W.D. Pa. Apr. 29, 2016) ("[T]he weight of authority is to permit standing to a plaintiff who acts as a tester.").

43. If the Website were accessible, *i.e.* if Mast General removed the access barriers described above, Mr. Murphy could independently research and purchase Mast General's products and access its other online content and services.

44.     Though Mast General may have centralized policies regarding the maintenance and operation of its Website, Mast General has never had a plan or policy that is reasonably calculated to make its Website fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

45.     The law requires that Mast General reasonably accommodate Mr. Murphy' disability by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

46.     Mr. Murphy has been, and in the absence of an injunction will continue to be, injured by Mast General's failure to provide its online content and services in a manner that is compatible with screen reader technology.

**DEFENDANT'S KNOWLEDGE OF ONLINE ACCESSIBILITY REQUIREMENTS**

47.     Mast General has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

48.     In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf) (last accessed Mar. 21, 2019).

49. Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

50. More recently, the United States Supreme Court declined to review a Ninth Circuit decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III") covers websites and (2) the imposition of liability on businesses for not having an accessible website does not violate the due process rights of public accommodations. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019) cert. denied 589 U.S. ___ (U.S. Oct. 7, 2019) (No. 18-1539).

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

51. There is no DOJ administrative proceeding that could provide Mr. Murphy with Title III injunctive relief.

52. While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Mr. Murphy with relief.

53. Mr. Murphy alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

54. Resolution of Mr. Murphy' claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Mast General offers content and services on its Website, and (b) whether Mr. Murphy can access the content and services fully and equally.

## SUBSTANTIVE VIOLATION

## Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

55. The assertions contained in the previous paragraphs are incorporated by reference.

56. Mast General's Website is a service of a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See West v. DocuSign, Inc.*, 2019 WL 3843054 (W.D. Pa. Aug. 15, 2019) (J. Schwab) ("Plaintiff's allegations support a theory that she was rendered unable to access property (*i.e*., the website) owned, operated, and controlled by Defendant. The legal argument raised by Defendant is, therefore, not supported by the Third Circuit authority which it cites, and runs contrary to decisions reached (and published) by this Court in substantially similar if not identical cases such as [*Gniewkowski v. Lettuce Entertain You Enterprises, Inc*., 251 F. Supp. 3d 908, 916–18 (W.D. Pa. 2017); *Suchenko v. ECCO USA, Inc.*, 2018 WL 3660117, No. 18-cv-0562-AJS (W.D. Pa. Aug. 2, 2018); and *Suchenko v. ECCO USA, Inc.*, 2018 WL 3933514, No. 18-cv-0562-AJS (W.D. Pa. Aug. 16, 2018)].").

57. In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Mast General does not provide Mr. Murphy with full and equal access to its Website, it has violated the ADA.

58. In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or

otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

59.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

60.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

61.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:  as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

62.     By failing to provide its Website's content and services in a manner that is compatible with auxiliary aids, Mast General has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a) denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Website;

(b) affording individuals with visual disabilities access to its Website that is not equal to, or effective as, that afforded others;

(c) utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d) denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e) failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

63. Mast General has violated Title III by, without limitation, failing to make its Website's services accessible by screen reader programs, thereby denying individuals who are partially sighted, visually impaired, or totally blind the benefits of the Website, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

64. Mast General has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

65. Making its online goods, content, and services compatible with screen readers does not change the content of the Website nor result in making the Website different, but enables individuals with visual disabilities to access the online store Mast General already provides.

66. Mast General's ongoing violations of Title III have caused, and in the absence of an injunction will cause, harm to Mr. Murphy and other individuals with visual disabilities.

67. Mr. Murphy' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

68. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Mr. Murphy requests relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

(A) A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that their Website is fully accessible to, and independently usable by, individuals with visual disabilities;

(B) A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in

compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully in paragraphs 12 through 25 above.

(C)     Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment. *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11);

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: April 13, 2020          Respectfully Submitted,

/s/ Lawrence H. Fisher
Lawrence H. Fisher
Pa. Bar ID #67667
One Oxford Centre
301 Grant Street, Suite 4300
Pittsburgh, PA 15219
Tel. (412) 577-4040
lawfirst@lawrencefisher.com

*Counsel for Plaintiff*